## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| ARLETA WATSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | Case No. CIV-20-1011-F |
| | ) | |
| VICI COMMUNITY DEVELOPMENT CORP. and CINDY ARNOLD, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

This case was tried before the court and a jury on May 3-6, 2022. Plaintiff, Arleta Watson, recovered damages on several of her state and federal claims against defendants Vici Community Development Corp. ("Vici") and Cindy Arnold. Judgment was entered on May 10, 2022.

Plaintiff was (and is) a resident of Vici Manor Apartments, a sixteen-unit federally-subsidized low-income apartment complex in Vici, Oklahoma. At trial, plaintiff's case centered on her claims (i) of disability discrimination under various sections of the Fair Housing Act and the Oklahoma Discrimination in Housing Act, (ii) for refusal to make reasonable accommodation under those statutes, (iii) for retaliation under the Fair Housing Act, (iv) for retaliation under the Oklahoma Anti-Discrimination Act and the Rehabilitation Act of 1973, and (v) for refusal to make reasonable accommodation and refusal to renew her lease under the Rehabilitation Act of 1973.

Although plaintiff was not successful in every respect, the jury returned verdicts in her favor of plaintiff on most of her claims,[1] awarding modest relief by way of damages.

The following post-trial motions are before the court:

1. Defendants' renewed motion for judgment as a matter of law, doc. no. 85.

2. Plaintiff's Rule 59 motion to correct the judgment, doc. no. 86.

3. Plaintiff's motion for attorney's fees, doc. no. 82.

The post-trial motions have been fully briefed and are at issue.  The court now rules on the motions, as well as the Rule 50 issues addressed at trial as to which ruling was reserved,  as set forth below.[2]

## I.
## The Renewed Motion for Judgment as a Matter of Law[3]

With a few exceptions (which will be addressed), defendants' renewed motion is premised on the assertion that plaintiff's claims fail as a matter of law on the issues of causation and damages (including punitive damages).

---

[1] Plaintiff asserted more than a dozen claims, the total count of which would depend on whether duplicative state and federal claims under substantially identical state and federal statutes are counted.

[2] The nature of this case, and the parties' contentions, are addressed at length in the court's orders at doc. no. 25 (motion to dismiss) and doc. no. 63 (summary judgment).  Those factual narratives will not be repeated here.  A more concise summary of plaintiff's claims, as submitted to the jury, may be found at pp. 6-9 of the jury instructions, doc. no. 76.  (Neither side had any objection to any of the court's instructions to the jury.)

[3] Plaintiff makes a perfunctory argument, devoid of specifics or citations to the record, to the effect that defendants are improperly arguing matters in their renewed motion that they did not argue in their original motion.  Doc. no. 95, at 5-6.  This contention is so superficially advanced that it defies analysis, let alone a ruling.  It is waived.  That said, the court's quick review of the transcript of the arguments on the Rule 50 motion reveals, with respect to the issue of causation, for instance, that defendants challenged causation repeatedly in arguing their motion.  Rule 50 motion transcript ("Mot. Tr."), doc. no. 101, at 7-10, 15-16, 23-24, 26, 28, 32-33.

A. Causation.

As for causation, defendants' essential argument, as applied to various statutory claims, is that plaintiff failed to make out a submissible case on the issue of whether defendants' actions vis-à-vis the plaintiff were taken because of (or, with respect to one claim, *solely* because of) plaintiff's disability.[4]  Defendants make their causation argument with respect to plaintiff's claims of disability discrimination, retaliation and refusal to renew the lease.

The causation issues arise against the backdrop of a long history of dealings, accompanied by a fair amount of animosity, between plaintiff and defendants.  In each instance encompassed by the causation arguments in defendants' motion, defendants took action vis-à-vis plaintiff, relating to various aspects of her tenancy (or at least occupancy of an apartment) at Vici Manor Apartments.  Plaintiff asserts, and defendants deny, that the actions adverse to plaintiff were taken because of plaintiff's disability.  In addressing the causation issues in their renewed motion, defendants take individual facts, one-by-one, arguing that each individual fact fails to support a finding that plaintiff was discriminated against, or was otherwise mistreated, because of her disability.  But the jury was obligated to look at the facts as a whole.[5]  And the court is not only obligated to look at the facts as a whole, it is,

---

[4] At argument on the defendants' Rule 50 motion, defendants' counsel acknowledged that "there is a jury dispute as to whether or not [plaintiff] has a disability."  Mot. Tr. at 9.  The court agrees. *Id.* at 5.

[5] At the instructions stage, the court considered it necessary to tell the jury in clear terms that, as to the discrimination claims, actions having nothing to do with plaintiff's disability could not provide a basis for recovery:

> Several of Ms. Watson's claims in this case relate to her alleged disability and to things the defendants allegedly did or did not do because of the alleged disability. Any disagreements, disputes, administrative problems or even personality conflicts that had nothing to do with Ms. Watson's alleged disability do not provide a basis for recovery on those claims.  For that reason, as you read and apply these

(cont'd. on next page)

at this juncture, obligated to view the evidence, together with all reasonable inferences therefrom, in a light most favorable to the plaintiff.  Moreover, the jury was entitled to, and likely did, draw inferences from some of the earlier episodes in the dealings between plaintiff and defendants, casting an unfavorable light on the defendants with respect to some of the later episodes.  In the main (and quite possibly in every respect), the jury's verdicts in this case would not have been the verdicts of the undersigned.  This court's own view of the evidence (as distinguished from the view the court is required to take for the purpose of determining whether to overturn the jury's verdicts) suggests that, save for one or two instances of shabby treatment with respect to exactly how plaintiff should pay her rent, the defendants had sound, non-discriminatory reasons for their actions vis-à-vis plaintiff and for wanting Ms. Watson to live elsewhere.[6]  But, acknowledging the jury's prerogative to draw inferences adverse to the defendants on the basis of its overall assessment of the defendants' treatment of the plaintiff, the court concludes that defendants' arguments for judgment as a matter of law on the issue of causation are unavailing. They are rejected.[7]  As to each of the claims in question, and viewing the evidence

---

instructions, it will be important to understand that, as to those claims which, under these instructions, are predicated on Ms. Watson's alleged disability and things that were allegedly done or not done because of the alleged disability, Ms. Watson would not be entitled to recover on account of things that defendants did or did not do that had nothing to do with Ms. Watson's alleged disability.

Instruction No. 12, doc. no. 76, at 18.

[6] In particular, the court has considerable sympathy with the plight (and, in many instances, the patience) of defendant Cindy Arnold, the long-serving apartment manager, in her attempts to deal professionally and constructively with plaintiff under difficult circumstances.

[7] Defendants' arguments with respect to the refusal to make a reasonable accommodation are likewise rejected.  Defendants argue that plaintiff's request to pay rent in the third week of the month was not "in anyway (sic) related to Ms. Watson's purported disabilities."  Doc. no. 85, at 6. But there was evidence from which the jury could have found that Ms. Watson's financial straits were traceable, at least in part, to her physical limitations.

favorably to the plaintiff, as it must, there was evidence from which the jury could have resolved the causation issues in favor of the plaintiff.[8]

B.  Compensatory damages.

In a vein similar to their arguments on the issue of causation, defendants argue that they are entitled to judgment as a matter of law on many of plaintiff's claims because of an absence of evidence of damages.  On her state and federal claims for housing discrimination, failure to accommodate, and retaliation, the jury was instructed that the elements of each claim included a requirement that, as a direct result of defendants' action, plaintiff sustained "some damage" (or just "damage"), even if merely nominal damage.[9]  Taking the jury instructions–to which, as has been noted, neither party had any objections–as the law of the case, plaintiff's claim for compensatory damages encompassed damages for "any mental pain, suffering or anguish that Ms. Watson experienced as a consequence of being discriminated or retaliated against by Vici or Ms. Arnold."[10]  That instruction also told the jury that "[n]o evidence of the monetary value of such intangible things as mental pain and suffering has been, or need be, introduced into evidence" and that "[t]here is no exact standard for fixing the compensation to be awarded for these elements of damage."[11]  The jury was also instructed that even though plaintiff asserted numerous claims, she was "not entitled to double or multiple recovery for the same injury" and that, on her state and federal discrimination and retaliation claims, she was entitled to

---

[8] The court reaches the same conclusion with respect to the state and federal retaliation claims, as to which defendants provide no developed argument.  Doc. no. 85, at 9.

[9] Instruction nos. 16, 17, 18, 19, 20, 23, 24 and 25, doc. no. 76.

[10] Instruction no. 26, doc. no. 76.

[11] *Id.*

nominal damages of one dollar if "her damages have no monetary value."[12]  The jury proceeded to award:

- $2,700 as compensatory damages for emotional pain and anguish.[13]

- $1 as nominal damages on the Rehabilitation Act discrimination and retaliation claims.[14]

- $0 as compensatory damages for unfair or deceptive trade practices with respect to late fees.[15]

- $27 as compensatory damages for unfair or deceptive trade practices with respect to concealing from plaintiff that her rent obligation was $300 rather than $309.[16]

- $5,600 against Vici Community Development Corp., by way of civil penalties for unfair or deceptive trade practices.[17]

- $700 against Cindy Arnold, by way of civil penalties for unfair or deceptive trade practices.[18]

- $250 against Vici Community Development Corp., by way of punitive damages.[19]

- $250 against Cindy Arnold, by way of punitive damages.[20]

In general, defendants' argument for judgment as a matter of law on the issue of compensatory damages is to the effect that "there is no explanation as to how Defendants' alleged conduct impacted Ms. Watson in any way," and that there is no testimony or documentation "evidencing any mental pain, suffering, or anguish that

---

[12] Instruction nos. 27 and 28, doc. no. 76.

[13] Verdict, doc. no. 79, at 9

[14] *Id.* at 13.

[15] *Id.* at 18.

[16] *Id.* at 19.

[17] *Id.* at 23.

[18] *Id.*

[19] Punitive Damage Verdict, doc. no. 80, at 1.

[20] *Id.* at 2.

she experienced as a result of any specific acts of discrimination or retaliation." Doc. no. 85, at 4. The problem, of course, is that, save for the $27.00 in compensatory damages relating to the amount of plaintiff's rent obligation (discussed in more detail later in this order), the entire compensatory damage award is in the inherently subjective category of emotional pain and anguish. Unlike, say, the cost of repairing a damaged car, this category of compensatory recovery defies objective proof. None is required. The court's own view of the matter diverges from the jury's assessment of the case. But, crediting plaintiff's account of her experiences as a tenant, including the disability and retaliation-related discrimination she claimed to have experienced, the fact remains that there was evidence from which the jury could have found that plaintiff suffered some measure–for which the jury awarded modest compensation–of emotional pain and anguish. The court rejects defendants' argument that they are entitled to judgment as a matter of law on the issue of damages.

C.  Punitive damages.

The most difficult aspect of defendants' motion is their challenge to the jury's award of punitive damages. It was by the "narrowest of margins" that the court instructed on punitive damages. Mot. Tr. at 37. The undersigned would not have awarded punitive damages.

The jury's award of punitive damages–$250 against each of the two defendants–was obviously minimal. This suggests that the jury may well have been moved to award punitive damages on the basis of a few discrete acts rather than on the basis of a finding that plaintiff was subjected to a persistent course of conduct.[21] The minimal punitive damage awards may also have been influenced by the jury's assessment of the financial condition of the defendants (more about that later), but

---

[21] The first stage instruction on punitive damages is at doc. no. 76, p. 38.

the court's evaluation of all of the evidence at trial suggests the probability that the main thing that drove the award down was the jury's focus, for this purpose, on a handful of discrete incidents. The incidents that come to mind are those relating to how and when plaintiff was required, in some instances, to pay her rent (*e.g.*, requiring plaintiff, on pain of default under her lease, and despite her physical limitations, to hand deliver her rent payment to the recreation center, and threatening her with default if she was "even one minute late" in paying her rent). Those incidents could be chalked up to simple pettiness amid an ongoing series of conflicts between plaintiff and the defendants–not really the stuff of which punitive damage awards are made. But, viewing the matter most favorably to the plaintiff (as the court must), there was also room for a jury determination that these incidents cleared the punitive damages bar, as set forth in the jury instructions. The defendants' challenge to the award of punitive damages is rejected.

## II.
### Plaintiff's Rule 59 Motion to Correct the Judgment

By way of a motion that is almost devoid of developed argument (which was met with an equally cursory response), plaintiff asks the court to increase her compensatory damage recovery for overpayment of rent from the $27 awarded by the jury to $369. Doc. no. 86 (response at doc. no. 92; reply at doc. no. 96). Plaintiff seeks a corresponding increase in the civil penalty assessment under the Oklahoma Consumer Protection Act from $5,600 to $13,200. Doc. no. 86, at 3.

The specifics of plaintiff's arguments are somewhat confusing, but the gist of it is that the jury apparently awarded compensation for three months of overpayments ($309 each month–when it should have been $300–for a total of $27, which would cover three months of overpayments) but should have awarded the $9 per month for forty-one months, for a total of $369. *Id.*

8

In the case as submitted to the jury, the $9 per month difference was sought only by way of plaintiff's claim under the Oklahoma Consumer Protection Act.  Jury Instructions, doc. no. 76, at 6, 9 (Inst. no. 3).  On that claim, the jury was instructed that, for plaintiff to prevail, she would have to prove (among other things) that "the defendant engaged in an unlawful practice under the OCPA by committing an unfair or deceptive trade practice."  *Id.* at 43 (Inst. no. 33).  An unfair trade practice was defined as any practice "which offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to a person."  A deceptive trade practice was defined as "a misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person."  *Id.*

In the twenty-three page verdict form, the jury was required to make a *specific* finding as to the number of times the defendants violated the OCPA by concealing the fact that the rent was $300 rather than $309.  Verdict Form, doc. no. 79, at 21.  The jury's answer, entered in longhand by the foreperson: 3.  The jury was also required to make a specific finding as to the total amount of the $9 overpayments for which plaintiff should recover under the OCPA.  The jury's answer, entered in longhand by the foreperson:  $27.  *Id.* at 19 ("Rent Obligation").

There was a contentious and convoluted course of dealings between the parties during the relevant forty-one month period.  During that period, innumerable communications took place between the parties (both directly and through counsel).  Given those facts, there was room for the jury to determine that, at some point,[22] enough facts were on the table (known, knowable, or imputable to plaintiff) to preclude a finding that, *on a continuing basis* (*i.e.*, month-by-month, to pick up the

---

[22] It cannot be determined with reasonable certainty that the beginning month for the $9 per month recovery would have been January, 2019, as asserted by plaintiff.

$9 each month), all of the elements of recovery under the OCPA had been proven by the greater weight of the evidence.  And on this point, the court cannot but add that its institutional deference to the jury's function as finder of fact (deference that has very much worked to the benefit of plaintiff in this order) works both ways.  To be sure, the $27 award may have been the result of an element of compromise in the jury room.  That happens day in and day out, especially in civil suits for damages.  But it is at least equally possible–and in fact quite plausible–that the jurors perceived a convergence of facts at some point that served to cut the recovery off at $27.  What is much less likely, given the way this claim was tried and then presented to the jury in the instructions and verdict form, is that the jury's unanimous decision to find three violations and fix the amount of the award at $27 was a complete bust.  In any event, "[i]t is well settled that a verdict will not be upset on the basis of speculation as to the manner in which the jurors arrived at it."  <u>Midwest Underground Storage, Inc. v. Porter</u>, 717 F.2d 493, 501 (10th Cir. 1983).  The Rule 59 motion to correct the judgment will be denied.[23]

### III.

### Plaintiff's Motion For Attorney's Fees

Plaintiff seeks to recover attorney's fees from both defendants.  Doc. no. 82.  Specifically, plaintiff[24] seeks to recover $105,335 in fees, consisting of $101,730 for the services of plaintiff's counsel and $3,605 for the services of support staff.  Doc.

---

[23] The corresponding request to increase the civil penalty assessment under the OCPA is, *a fortiori*, without merit.  Under the instructions, the jury was required to set that penalty on the basis of "the total number of times the practice was committed."  Jury Instructions, doc. no. 76, at 45 (Inst. no. 35).

[24] For the sake of brevity, the court will refer to the plaintiff as the party seeking recovery of fees.  (That is how the fee motion reads.)  But, as discussed below, there is no showing that plaintiff has paid any attorney's fees, that she is obligated to do so, or that she has entered into any agreement transferring any right she may have to recover fees to any other entity.

no. 82, at 6.[25]  In response, defendants argue that the fee motion should be denied because (i) the court should grant the defendants' motion for judgment as a matter of law (a contention the court has rejected), and (ii) an award of fees "would likely bankrupt a non-profit corporation that spends its resources seeking to provide high-quality housing to elderly and disabled individuals in rural Oklahoma, including Plaintiff herself."  Doc. no. 91, at 4.

A.  Preliminary matters.

Some preliminary matters should be addressed.  First, plaintiff asserts that "[e]ach claim arose out of a common core of facts."  Doc. no. 82, at 9.  That concept is, of course, relevant to the fee award process where several claims are pressed on varying legal bases–especially where plaintiff was successful on some claims and not on others.  Plaintiff's common-core-of-facts argument is meritorious in some respects.  For instance, it would make no sense on the facts of this case to try to parse out the time spent prosecuting the unsuccessful claim relating to testifying on behalf of Judy McAdoo, or the unsuccessful claim for breach of contract.[26]  But it is still relevant to look at what relief was recovered on which claim, because that may inform the court's assessment of some aspects of plaintiff's fee claim.

---

[25] Plaintiff proposes an hourly rate of $300.  This is not supported by evidence that plaintiff's counsel has actually charged and been paid at that rate.  Instead, plaintiff simply refers to a rate approved by another court with respect to other attorneys in another case, Chatman v. Buller, 2013 WL 5729603 (E.D. Okla. Oct. 22, 2013).  However, defendants do not challenge the proposed hourly rate, so that aspect of the matter warrants no further attention.  The application also presents some potentially significant block billing problems.  See, Cadena v. Pacesetter Corp., 224 F.3d 1203 (10th Cir. 2000), and Ramos v. Lamm, 713 F.2d 546 (10th Cir. 1983).  In view of the court's disposition of the fee motion, that aspect of the matter likewise requires no further attention.

[26] The fact that most of plaintiff's claims, state or federal, rested on a common core of facts works to her benefit for purposes of adjudication of the fee motion in this case because, to the extent there may be material differences among the available statutory provisions, she gets to pick those which best suit her purposes.

B.  The extent of plaintiff's success.

It has been noted, but bears repeating, that plaintiff's damage recovery consists of the following components:

- $2,700 for emotional pain and mental anguish under the Fair Housing Act, the Oklahoma Discrimination in Housing Act and the Oklahoma Anti-Discrimination Act.[27]

- $1 on the Rehabilitation Act § 504 discrimination and retaliation claims.

- $27 under the Oklahoma Consumer Protection Act for overpayment of rent.

- $5,600 against Vici by way of penalties under the OCPA.

- $700 against Ms. Arnold by way of penalties under the OCPA.

- $250 in punitive damages against Vici.

- $250 in punitive damages against Ms. Arnold.

- In addition, the jury made a finding, under the Oklahoma Residential Landlord and Tenant Act, that plaintiff was entitled to a written demand for rent prior to the filing of the August, 2020 forcible entry and detainer action.  Verdict Form, doc. no. 79, at 14.  (No damages were sought under the ORLTA.)

No injunctive relief was sought at or after trial, and this case presented no issue as to whether plaintiff has a right to continued possession of an apartment at Vici Manor.[28]

---

[27] Plaintiff does not seek fees under the Oklahoma Anti-Discrimination Act.  Doc. no. 82, at 2, 6-7.

[28] The court so informed the jury at trial.  This court does not determine, in this case, whether plaintiff currently has a right to be, and remain, in possession of the apartment she has occupied.  That is for another court to decide.  This court's own view of the evidence (as distinguished from the view the court is required to take for the purpose of determining whether to overturn the jury's verdicts) suggests that the defendants have sound, non-discriminatory and nonretaliatory reasons for wanting Ms. Watson to live elsewhere.

C.  Discussion.

Fee awards are discretionary under the Fair Housing Act, the Oklahoma Discrimination in Housing Act, and the Rehabilitation Act.  *See*, respectively, 42 U.S.C. § 3613(c)(2), 25 O.S. § 1506.3(2), and 29 U.S.C. § 794a(b).  In contrast, the fee provisions of the Oklahoma Consumer Protection Act and the Oklahoma Residential Landlord and Tenant Act are expressed in mandatory terms.  *See*, respectively, 15 O.S. § 761.1(A) and 41 O.S. § 105(B).  The framework for the court's exercise of such discretion as it may have is discussed in Parts D and E, below.

The $105,335 plaintiff seeks in her fee motion is more than eleven-fold plaintiff's damage recovery.  Going into the trial, plaintiff asserted entitlement to more than $207,000 in damages (not counting $2,000 sought for each violation of the Oklahoma Consumer Protection Act).  Doc. no. 66 (Pretrial Report), at 8-9. Plaintiff's total damage recovery amounted to less than 4.6 percent of the amount she sought.

The court's consideration of plaintiff's fee motion is influenced, to one degree or another, by the following considerations:

1.  Plaintiff does not claim that she has paid any attorney's fees, that she is obligated to do so, or that she has entered into any agreement transferring any right she may have to recover fees to any other entity.[29]  The benefit accruing to Ms. Watson from her successful litigation of her claims in this case will not be affected by the court's determination of the fee motion.

2.  The real party in interest with respect to the fee claim is Legal Aid Services of Oklahoma, Inc. ("LASO").  Doc. no. 82-1, ¶ 8 (Affidavit of plaintiff's counsel:

---

[29] Plaintiff acknowledges, by quoting the relevant portion of Rule 54(d)(2), Fed.R.Civ.P. (doc. no. 82, at 6), that she is obligated to disclose any fee agreement she may have entered into in this case. None has been disclosed.

"Although I am a Legal Aid attorney, it is customary for Legal Aid to pursue the recovery of costs and attorney time expended in cases such as this one.").

3. Any payment of fees by Vici to LASO would be a transfer of funds from one federally-subsidized entity to another. But there is one difference. According to the most recent publicly available reports (as of calendar year end, 2020), LASO had $5.7 million in current assets (including $3.8 million in cash and cash equivalents), net assets of $3.9 million, and had received $16.2 million in annual revenues, of which $5.1 million was from Legal Services Corporation.[30] In contrast, the credible testimony of Cindy Arnold establishes that Vici is borderline insolvent, and may well be rendered insolvent by this case *even apart* from exposure to a fee award. At the time of trial, Vici had approximately $23,000 in its reserve account and $7,000 in its operating and maintenance account. Doc. no. 85-1, p. 116 (testimony of Cindy Arnold). It does not have the money to replace tenants' windows that are in need of replacement. *Id.* at 182-83. The short of the matter is that Vici, an organization whose only mission is to provide safe, decent housing to low-income elderly and disabled individuals in a remote rural community,[31] is barely hanging on. As Cindy Arnold described in detail at trial, Vici carries out its mission with the help of significant rental assistance from the Department of Agriculture's Rural Development multi-family housing rental assistance program.[32] As for defendant Cindy Arnold herself, although the record is less clear, it appears that her modest livelihood consists of compensation for her services as the treasurer for the Vici public schools and as site manager for the apartments since 1995. *Id.* at 3, 113.

---

[30] https://www.legalaidok.org/wp-content/uploads/2021/05/2020-Audit-and-Financial-Statements.pdf

[31] The population of Vici, Oklahoma, is approximately 600. Arnold tr., 113.

[32] For general background information, see: https://www.rd.usda.gov/programs-services/multi-family-housing-programs.

Her compensation as site manager was recently raised to $1,200 per month.  *Id.* at 116.[33]

D.  Guiding principles–apart from considerations of defendants' financial resources.

Broadly speaking, there are noticeable similarities between Oklahoma and federal fee-shifting law.  Even where the beginning point is the familiar lodestar calculation, Oklahoma fee-shifting law[34] requires the court to further inform its judgment by drawing two distinct comparisons: (i) the proposed fee vs. the amount in controversy and (ii) the proposed fee vs. the result obtained.  The Oklahoma Supreme Court provided unequivocal guidance in Parsons v. Volkswagen of America, 341 P.3d 662 (Okla. 2014), stating (in boldface): "**In all cases, the**

---

[33] As will be seen, the court's findings as to the very marginal financial condition of Vici and the modest financial circumstances of Cindy Arnold have a significant impact on the court's approach to resolution of the fee motion.  The facts as to the finances of the defendants were not central to the trial, but they were addressed to the extent indicated in the accompanying text.  Prominent in defendants' response to the fee motion was the assertion that a significant fee award would bankrupt Vici.  Doc. no. 91, at 4.  Plaintiff, though entitled under LCvR7.1(i) to file a reply challenging this assertion, did not do so (and has not otherwise challenged it).  Nevertheless, if plaintiff takes issue with the court's basic findings as to the financial condition of these defendants and wishes to have a hearing to flesh out the record (presumably with the goal of proving that they are financially better off than the record so far would indicate), plaintiff may file a motion requesting such a hearing within seven days after the date of filing of this order.

[34] The Oklahoma cases cited here involve fee shifting under the Oklahoma Consumer Protection Act (Tibbetts) and the Oklahoma class action statute (Parsons).  The federal cases cited here involve fee shifting under 42 U.S.C. § 1988, which is probably the most prolific source of federal fee-shifting decisions.  The main divide in the realm of fee-shifting statutes, state or federal, is whether the statute speaks in mandatory or discretionary terms (typically, either "shall" or "may").  (And all of the statutes relevant here–whether mandatory or discretionary–speak in terms of "reasonable" fees.  As will be seen, even under mandatory fee statutes, a reasonable fee is sometimes no fee at all.)  Because of the relative paucity of decisions under the federal statutes that are directly relevant here, the court derives valuable guidance from the federal cases under § 1988.  Absent variations in statutory language that would make it inappropriate to rely on cases under one fee-shifting statute when ruling on a fee application governed by another one, that sort of cross-referencing is common.  *E.g.*, Cohen v. West Haven Board of Police Com'rs, 638 F.2d 496, 505 n.15 (2ⁿᵈ Cir. 1980).  Cohen foretold the Supreme Court's comment, in Hensley v. Eckerhart, 461 U.S. 424, 432 n.7 (1983) that "[t]he standards set forth in this opinion are generally applicable in all cases in which Congress has authorized an award of fees to a 'prevailing party.'"

**attorney fees must bear some reasonable relationship to the amount in controversy**." *Id.* at 667.  As for the result obtained, the Oklahoma Court has made it clear that a paltry result will not support a big fee.  Tibbetts v. Sight 'n Sound Appliance Centers, Inc.. 77 P.3d 1042, 1049 (Okla. 2003).  To be sure, Tibbetts involved a technical win for the plaintiffs, garnished with only nominal relief, while in this case the relief won by the plaintiff, though truly modest (especially when compared to the damages she sought and the fee she now seeks), can hardly be called nominal.  For that reason, the court does not regard Tibbetts, with its conclusion that sometimes "the only reasonable fee . . . is no fee at all," *id.* at 1050 (quoting from Farrar v. Hobby, 506 U.S. 103, 115 (1992), as providing a basis for denial of the fee motion now before the court.  But Tibbetts, fairly read, does tell this court that where the result obtained is dwarfed by the amount sought (and the fee sought), that fact cannot be ignored when the court is called upon to set a reasonable fee for counsel's services in securing that result.[35]  Tibbetts is persuasive even though the Court justified its disapproval of the fee, in part, by noting that plaintiff sought "only money damages."  In the case at bar, the one form of non-monetary relief plaintiff won was a declaration that, because she proved that her tenancy did not expire on May 31, 2019, she was entitled to a written demand prior to the filing of one of the eviction actions.  Doc. no. 79 (Verdict Form), at 14.  This is not the sort of enforcement of a civil right (let alone a constitutional right), typically as beneficial to the general public as to the successful plaintiff, that amounts to a "vindication of important rights, even when large sums of money are not at stake." Farrar, 506 U.S. at 122 (O'Connor, J., concurring).  Moreover, the typical case in which the non-monetary relief supports a substantial fee recovery is one in which the relief *in specie*

---

[35] It is also worth noting that, in Parsons, the Court took note of the fee plaintiffs' counsel would have collected on a contingent fee basis.  341 P.3d at 672.  In the case at bar, with a 50 percent contract, plaintiff's counsel would have received less than $5,000.

is so substantial as to amount to "essentially complete relief." Hensley v. Eckerhart, 461 U.S. 424, 431 (1983). The jury's determination that plaintiff should have received a notice to quit, though based on facts overlapping with the "common core," was not central to her case and cannot be said to have amounted to "essentially complete relief."

Federal fee-shifting law is much the same (in some respects because the Oklahoma Supreme Court has explicitly adopted the reasoning of the U.S. Supreme Court's fee cases). For fee-shifting purposes under federal fee statutes, plaintiff's status as the prevailing party is only the beginning point. That status "brings the plaintiff only across the statutory threshold. It remains for the district court to determine what fee is 'reasonable.'" Hensley, 461 U.S. at 433.

Where the controlling statute speaks in discretionary terms, "that discretion is not without limit: the prevailing party 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust.'" Blanchard v. Bergeron, 489 U.S. 87, 89 (1989) (under § 1988, quoting from Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 402 (1968), and Hensley v. Eckerhart, 461 U.S. 424, 429 (1983)). Consequently, "[t]he district court's discretion to deny fees to a prevailing plaintiff is 'quite narrow.'" Dahlem v. Bd. of Ed. of Denver Public Schools, 901 F.2d 1508, 1514 (10th Cir. 1990) (quoting from Chicano Police Officer's Ass'n v. Stover, 624 F.2d 127, 129 (10th Cir. 1980)). A "strong showing of special circumstances is necessary." Id. Nevertheless, the court's discretion in cases under the Fair Housing Act does include the discretion, in appropriate cases, to award no fee at all. LeBlanc-Sternberg v. Fletcher, 143 F.3d 748, 758 (2d Cir. 1998).

Where the fee is awardable under a federal statute, the "most critical factor" is the "difference between the judgment recovered and the recovery sought." Zinna v. Congrove, 680 F.3d 1236, 1240 (10th Cir. 2012) (quoting Phelps v. Hamilton, 120

F.3d 1126, 1131 (10th Cir. 1997)).  Here, as has been noted, the total damage recovery (assuming it can be collected) is less than five percent of the damages sought (and less than ten percent of the fee sought).  The usual drill in setting a fee under a federal statute is to start with a lodestar calculation, Praseuth v. Rubbermaid, Inc, 406 F.3d 1245, at 1257 (10th Cir. 2005), which is then evaluated in light of the twelve factors listed in Johnson v. Georgia Highway Express, 488 F.2d 714 (5th Cir. 1974).  But, in some cases, the beginning numbers are so stark that the usual drill makes no sense.  "Having considered the amount and nature of damages awarded, the court may lawfully award low fees or no fees without reciting the 12 factors bearing on reasonableness . . . or multiplying the number of hours reasonably expended . . . by a reasonable hourly rate."  Farrar v. Hobby, 506 U.S. 103, 115 (citation and internal quotation omitted).  The court notes, again, that the case at bar is not a nominal damage case.  Although that difference between this case and Farrar means that Farrar cannot be regarded as controlling authority in the usual sense, nothing in Farrar suggests that the Court's embrace of common sense in that case is limited to nominal damage situations.  The Court's essential reasoning in Farrar remains relevant, albeit with diminished impact, even when the verdict includes something more than nominal damages.

E.  Relevance of the parties' comparative financial resources.

On the question of whether consideration of the parties' financial resources can provide those "special circumstances" in a fee-setting context, the court starts with the understanding that, with only a few exceptions–for instance, bankruptcy law and the law of punitive damages–courts are required to adjudicate rights and obligations without noticing (or at least by pretending not to notice) the financial resources of the contending litigants.  Consequently, it is a rare case in which it is appropriate for the court, in setting a reasonable fee, to take ability to pay (or *relative* financial resources) into account.  But consideration of financial resources is not

always excluded. "[W]e have held that, in setting a fee, the court may take into account the relative wealth of the parties." <u>Cohen v. West Haven Board of Police Com'rs</u>, 638 F.2d 496, 505 (2nd Cir. 1980) (employment discrimination case).[36] Financial resources may be taken into account "irrespective of whether the defendant is public or private," but should "only be given substantial weight in cases of real or extreme hardship." <u>Vulcan Soc. of Westchester County</u>, 533 F.Supp. 1054, 1060 (S.D.N.Y 1982) (Soafer, J.) (fee under 42 U.S.C. § 1988). In a case under the Fair Housing Act and § 1988, one court has observed that although the fee-shifting provisions "advance many sound social objectives," those objectives do not include "causing the financial ruin of persons of limited means." <u>Mariani v. Banat Realty</u>, 1993 WL 86530 (E.D.N.Y. Mar. 18, 1993), *1. The court indicated its intent to give "substantial weight to the wealth of the losing party," <i>id.</i>, and called for submissions shedding light on the defendant's financial condition.

Absent other compelling considerations, there would, in the court's view, be little or no justification for taking the parties' relative financial resources into account in setting the fee to be recovered by the prevailing party. Losing litigants should not routinely be bailed out just because they find themselves in difficult financial circumstances. But, in the case at bar, the court can and will take into account the fact that the economic impact of a fee award would be close to negligible for the beneficiary of the award, but in all probability ruinous to the defendants.

---

[36] The Tenth Circuit appears to agree, albeit in a somewhat ambiguous unpublished decision, <u>Hastings v. Int'l Brotherhood of Painters & Allied Trades</u>, 931 F.2d 62 (10th Cir. 1991). Rejecting the union's financial hardship argument, the court said that "[t]he financial condition of the defendant should not be employed to reduce an otherwise appropriate award of attorney's fees." <i>Id.</i> at *4. But in the next sentence, the panel told us that "[a]bility to pay should be given substantial weight only in those cases where there is extreme and proven financial hardship present." <i>Id.</i> A fair reading of the Order and Judgment suggests that, as far as that panel was concerned, the parties' financial resources could, in exceptional cases, be taken into account as one factor informing the court's discretion.

F.  Conclusion–as to the fee motion.

Where a more-than-nominal fee award would likely bankrupt the losing litigant but would not (even if it could be collected over time) make more than a negligible difference in the financial condition of the beneficiary of the award (here, LASO), the request for the award naturally tends to take on the character of a request for another layer of punishment. The jury has spoken on the issue of punishment, awarding $250 in punitive damages against each of the two defendants. Even in this sort of a situation, imposition of another layer of punishment may, at times, be warranted. But the court concludes that the case at bar is not such a case.  The combined effect of several factors leads the court to the conclusion that plaintiff's fee motion should be denied:

- A fee award would not in any sense be compensatory to plaintiff.  She has paid no fees and is not obligated to do so.

- The fee sought is vastly disproportionate to both the amount sought and the amount recovered.  Because the non-economic relief obtained by plaintiff was not central to the case and did not amount to "essentially complete relief," the fact that plaintiff sought relief other than money damages does not significantly mitigate the effect of the disparity between the fee sought vs. the amount in controversy and the amount recovered.

- The ability of Vici to continue to provide decent housing to poor and otherwise vulnerable individuals would likely be seriously compromised by an award of fees.  This would not serve the purposes of the Fair Housing Act and the related Oklahoma statutory provisions.

- A fee award against Vici would amount (if collected–a dubious proposition) to a transfer of funds from a borderline insolvent federally-subsidized organization to one that is far from insolvent.

Absent the compelling considerations discussed here, it would be hard for the court to conclude, or even come close to concluding, that a reasonable fee is no fee at all.  Plaintiff's courtroom victory was hard-won and required a lot of work.  But the court concludes that those undeniable facts, normally more than sufficient to

support a substantial fee award, do not carry the day.  The fee motion, doc. no. 82, will be denied.

Conclusion

Defendants' renewed motion for judgment as a matter of law, doc. no. 85, is **DENIED**.[37]  As to those aspects of defendants' Rule 50 motion, as made at the conclusion of the evidence at trial, with respect to which ruling was reserved (*e.g.*, Mot. Tr. at 39 (CARES Act), 40 (Oklahoma Residential Landlord and Tenant Act), 47 (Oklahoma Consumer Protection Act); Minute Sheet, doc. no. 75, at 2), that motion is now **DENIED**, and the reiterated version of defendants' motion on those issues is likewise **DENIED**.[38]

The Rule 59 motion to correct the judgment, doc. no. 86, is **DENIED**.

The motion for attorneys' fees, doc. no. 82, is **DENIED**.

IT IS SO ORDERED this 1st day of September, 2022.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

20-1011p026.docx

---

[37] The motion is denied as to all arguments made in the motion, whether or not specifically addressed in this order.

[38] As to all of these matters, the court applies the standard it articulated at trial.  Mot. Tr. at 2.